IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| DON H. SMITH, ) | Civil Action No. 3:07-1674-DCN-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

On February 9, 2001, Plaintiff applied for DIB. Plaintiff's application was denied initially and on reconsideration, and he requested a hearing before an administrative law judge ("ALJ"). After a hearing held August 8, 2002, at which Plaintiff appeared and testified, the ALJ issued a decision dated September 11, 2002, denying benefits and finding that Plaintiff was not disabled because he retained the ability to perform light jobs existing in significant numbers in the national economy. In July 2004, the Appeals Council granted Plaintiff's request for review of the ALJ's decision (because the record upon which the ALJ's decision was based could not be located) and remanded the case back to the ALJ.

Another ALJ held a hearing on August 21, 2006, and Plaintiff was allowed to submit additional evidence. On November 9, 2006, the ALJ issued a decision denying benefits. The ALJ

found that Plaintiff was not disabled because under the medical-vocational guidelines (also known as the "Grids") promulgated by the Commissioner, Plaintiff remains able to perform work found in the national economy. See generally 20 C.F.R., Part 404, Subpart P, Appendix 2.

Plaintiff was forty-seven years old on the date he was last insured for benefits (December 31, 2004). He has a high school education with some training as a welder and past relevant work as a plant worker, truck driver, and maintenance worker. Plaintiff alleges disability since November 28, 2000, due to a back injury, carpal tunnel syndrome, sleep apnea, pain and swelling in his legs, and anxiety.

The ALJ found (Tr. 16-20):

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2004.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of November 28, 2000 through his date last insured of December 31, 2004 (20 CFR 404.1520(b) and 404.1571 *et seq*.).

3. Through the date last insured, the claimant had the following severe impairments: peripheral vascular disease, small disc bulge in the neck, and lumbar stenosis (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work. He could lift up to 10 pounds and sit for 6 hours and stand/walk for 2 hours in a normal 8-hour work day.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7.     The claimant was born on December 30, 1957, and was 47 years old on the date last insured, which is defined as a younger individual age 45-49 (20 CFR 404.1563).

8.     The claimant as at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.     Through the date[] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11.     The claimant was not under a "disability," as defined in the Social Security Act, at any time from November 28, 2000, the alleged onset date, through December 31, 2004, the date last insured (20 CFR 404.1520(g)).

On April 20, 2007, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner. Plaintiff filed this action on June 15, 2007.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

**DISCUSSION**

Plaintiff injured his back while moving trees at work on January 25, 1999. See Tr. 75, 140. On March 10, 1999, Dr. Leonard Forrest, a physical medicine and rehabilitation specialist, noted that MRI scans of Plaintiff's neck and low back revealed "congenitally short pedicles [] in the lumbar area," but were otherwise "fairly unremarkable." Tr. 177, 180. Dr. Forrest diagnosed Plaintiff with muscular/mechanical pain, prescribed Relafen, and recommended physical therapy. Tr. 180.

On March 17, 1999, an EMG and nerve conduction study was consistent with bilateral carpal tunnel syndrome with no evidence of denervation, cervical or lumbar radiculopathy, or other peripheral nerve injury. Tr. 171-176. Plaintiff was evaluated by Dr. John Ernst, an orthopedist, on March 22, 1999. Tr. 139-140. On April 12, 1999, Dr. Ernst diagnosed Plaintiff with bilateral carpal tunnel syndrome and recommended surgical decompression on the right. Tr. 139. In April 1999, Dr. Forrest noted that Relafen, physical therapy, and an epidural injection had been helpful in relieving Plaintiff's low back symptoms, but that Plaintiff still complained of significant symptoms. Tr. 145, 168-170.

On May 4, 1999, Plaintiff underwent carpal tunnel release surgery on his right wrist. Ten days later, Dr. Ernst noted that Plaintiff's surgical wounds were benign and Plaintiff had full range of motion with encouragement. Tr. 137. On May 28, 1999, it was noted that Plaintiff had restarted physical therapy for his back and was mobilizing better, but still had low back pain. Dr. Forrest recommended another epidural injection, which was administered on July 2, 1999. Tr. 144, 166-167. On June 7, 1999, Dr. Ernst noted that Plaintiff was doing well and steadily improving. Plaintiff had full range of motion. Dr. Ernst recommended strengthening exercises and scar massage, and

said that Plaintiff could advance to full use by July 1, 1999. He also noted that Plaintiff's left wrist remained quiescent. Tr. 137. On June 23, 1999, Plaintiff complained of persistent symptoms. Dr. Forrest noted that Plaintiff was not progressing as well as he hoped and that Plaintiff might not be able to go back to his previous work. Tr. 165.

On July 7, 1999, a functional capacity evaluation was completed by Mike Kelley, a physical and occupational therapist. Mr. Kelley opined that Plaintiff was able to work at the sedentary level for eight hours a day. He noted that the results of the evaluation also indicated that Plaintiff had symptom/disability exaggeration behavior and Plaintiff only passed three of twenty-two validity criteria which suggested very poor effort or voluntary submaximal effort not related to pain, medical impairment, or disability. Tr. 71-91.

On July 8, 1999, Plaintiff reported to Dr. Forrest that he did not have significant improvement from his most recent lumbar epidural injection. Tr. 164. On July 15, 1999, Plaintiff complained of low back symptoms and said his neck was okay if he did not turn his head too quickly. It was noted that Plaintiff had normal neck range of motion, no neurologic deficits in his extremities, and the ability to bend to within two to three inches of touching his toes. Dr. Forrest opined that Plaintiff was at maximum medical improvement, assigned a five percent permanent of the whole person impairment rating for Plaintiff's low back, and imposed the following restrictions:

> I would keep lifting at a maximum of 20 pounds. Additionally, I would have him avoid more than occasional bending, squatting, kneeling, crawling, or climbing. Actually, I would have him avoid the ladder entirely. These restrictions would place him at a light duty level. [He] can work light duty at any time. He is not cleared for his previous work, however.

Tr. 163.

On July 16, 1999, Dr. Ernst noted that Plaintiff had a slight induration of his scar and full range of motion. He wrote that Plaintiff's recent nerve studies showed mild left median nerve slowing and that clinical examination and history were benign. Dr. Ernst opined that Plaintiff could use his hand fully, but should be monitored for safe operation. Tr. 136-137.

On July 20, 1999, Dr. Petru Groza, Plaintiff's primary care physician, indicated that Plaintiff could return to work on July 21, 1999. Tr. 98.[1] Plaintiff apparently was unable to work on August 13, 1999, and Dr. Groza indicated that Plaintiff would be able to return to work on August 28, 1999. Tr. 96-97.

On August 20, 1999, Plaintiff reported to Dr. Forrest that he had been put back on regular duty at his pipeline crew job and was unable to do it. Dr. Forrest noted that Plaintiff had not been cleared to work at regular duty on the pipeline crew and gave him a note stating that if light work was not available, then he was not cleared to work. Tr. 160-161.

On August 27, 1999, Plaintiff complained of aching in his palm. Dr. Ernst noted that Plaintiff had full range of motion, normal two-point discrimination, and negative Tinel's sign.[2] He recommended that Plaintiff continue with full use of his hand and work more aggressively on scar massage desensitization. Tr. 132, 136.

---

[1]Dr. Groza's treatment notes are not part of the current record. The record contains a summary of Plaintiff's medical history which indicates that Dr. Groza treated Plaintiff between August 1998 and May 2001, for various conditions including lumbar and cervical pain, wrist pain, obstructive sleep apnea, and venous insufficiency. Tr. 99-114.

[2]Tinel's sign is:
a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve.
Dorland's Illustrated Medical Dictionary 1703 (30th ed. 2003).

On September 3, 1999, Plaintiff complained of difficulty bending and sweeping at work due to low back pain. Dr. Forrest excused Plaintiff from work over the holiday weekend, prescribed Vioxx, and imposed work restrictions to limit sweeping and bending. He also opined that Plaintiff was capable of working. Tr. 159. On September 24, 1999, Plaintiff complained of burning symptoms in his hands, back, and right leg. Dr. Forrest prescribed Klonopin. Tr. 158.

On September 27, 1999, Plaintiff complained to Dr. Ernst of some wound tenderness and weakness on the right and diffuse burning in his left hand. Dr. Ernst noted that Plaintiff had full range of motion with some give away on the right with normal sensation to light touch. On the left, Plaintiff had full range of motion with some give away, 5- strength, variable two-point discrimination, equivocal Tinel's and Phalen's[3] signs, normal refill and color, and symmetrical reflexes. Tr. 131, 136. Dr. Ernst recommended nerve studies, which were performed by Dr. G. Richardson, III on September 29, 1999. The studies were consistent with bilateral carpal tunnel syndrome, right greater than left, with no evidence of denervation or cervical radiculopathy. Tr. 152-156. Dr. Richardson imposed an additional work restriction of no sweeping. Tr. 157.

On October 8, 1999, Plaintiff reported neck twitching and constant numbness in all his fingers. Upon examination, the right carpal canals were benign with slight postoperative tenderness. Plaintiff had negative Tinel's and Phalen's signs, symmetrical motor groups, intact sensation to light touch, and intact two-point discrimination. Dr. Ernst opined that Plaintiff was improving, but had

---

[3]Phalen's sign or maneuver is used for the detection of carpal tunnel syndrome in which: the size of the carpal tunnel is reduced by holding the affected hand with the wrist fully flexed or extended for 30 to 60 seconds, or by placing a sphygmomanometer cuff on the involved arm and inflating to a point between diastolic and systolic pressure for 30 to 60 seconds.
Dorland's Illustrated Medical Dictionary 1094 (30th ed. 2003).

not completely improved and had somatic symptoms. He concluded that there were no significant signs either by history or physical examination of carpal tunnel syndrome bilaterally, and referred Plaintiff to Dr. James Bumgartner, a neurologist. Tr. 127-128. Dr. Ernst also indicated that Plaintiff could return to work.  Tr. 129.

On October 15, 1999, Dr. Forrest wrote that there was clinically no definite true neurologic weakness through Plaintiff's left arm, although there was some tendency to give way. On November 3, 1999, Dr. Forrest noted that an MRI of Plaintiff's cervical spine was normal and an EMG and nerve conduction study showed evidence consistent with carpal tunnel syndrome, but was negative for any evidence of cervical radiculopathy. Dr. Forrest recommended that Plaintiff be evaluated by Dr. Ernst and confirmed his prior impairment rating and work restrictions. Tr. 149-150, see Tr. 190-191.

Dr. Bumgartner examined Plaintiff on November 10, 1999. He noted that Plaintiff had full cervical range of motion, normal peripheral pulses in both upper extremities, intact sensation to pinprick in both upper extremities, a positive Tinel's sign with percussion over the left median nerve, and no changes to suggest reflex sympathetic dystrophy. Plaintiff also had a normal gait and tandem walk; intact cranial nerves; normal muscle bulk, strength, tone, and fine motor movements; normal finger to nose movements; trace and symmetric upper extremities reflexes; trace knee jerks; absent ankle jerks; and a neutral plantar response. Dr. Bumgartner diagnosed Plaintiff with upper extremity paresthesias and pain of unknown etiology, noting that there were "no objective abnormalities by exam indicative of radiculopathy or myelopathy." Tr. 115-117.

On March 3, 2000, at the request of Plaintiff's attorney, Benson Hecker, Ph.D. (a vocational consultant) reviewed Plaintiff's medical evidence, interviewed Plaintiff, and completed an evaluation

of Plaintiff's vocational training potential. Dr. Hecker wrote that Plaintiff injured his back and upper extremities at work; treatment measures had not significantly improved his pain or functional capacity; his chronic pain required him to stop activities, switch positions, take medications, and lie down; and he had a profound sleep disturbance. Dr. Hecker opined that Plaintiff had limited capacities to sit, stand, walk, lift/carry, forward bend, stoop/squat, turn/twist, reach, kneel, crawl, use arm and leg controls, meet attendance standards, and effectively deal with normal work stresses. He also opined that Plaintiff was unable to perform any of his past relevant work and was unable to perform any substantial gainful work activity which existed in significant numbers in open competition with others. Tr. 99-114.

Nerve conduction studies on Plaintiff's upper extremities revealed median and ulnar sensory neuropathy bilaterally on April 21, 2000. Tr. 115. On May 12, 2000, Dr. Ernst noted that nerve studies showed mild improvement from Plaintiff's previous (September 1999) studies and that Plaintiff's primary complaint was consistent hypesthesia of his right index fingertip. Physical examination revealed that Plaintiff had nonspecific forearm tenderness, benign and nontender carpal canals, negative Tinel's and Phalen's signs, full range of motion of his wrists and fingers, giveaway on strength testing, normal refill and color, and absent two-point discrimination in his right index finger. Dr. Ernst assessed a ten percent partial impairment to the right and left hands for Plaintiff's median nerve symptomatology. Tr. 118-122.

Plaintiff complained of continued neck symptoms and worsening low back symptoms on May 19, 2000. Dr. Forrest noted that Plaintiff had experienced improvement with previous injections and recommend another one, which was administered on June 7, 2000. Tr. 142, 148. On June 28, 2000, Dr. Forrest recommended physical therapy, as Plaintiff still complained of significant symptoms. Tr.

147. On September 11, 2000, Dr. Forrest noted that Plaintiff had gone for physical therapy and was taking Celebrex and Klonopin, but still had continuing symptoms and difficulty sleeping. Dr. Forrest prescribed Pamelor in place of Klonopin. Tr. 146.

Additional medical evidence was submitted to the Appeals Council after the ALJ's decision. On July 13, 2004, Dr. Jeffrey Kramer (an internist) noted that Plaintiff took Klonopin for anxiety, had hypertension which was under pretty good control on Hyzaar, and had occasional lower extremity swelling which was well-controlled with Lasix. Tr. 224. On September 9, 2004, Dr. Kramer noted that Plaintiff had stable peripheral vascular disease and hypertension, obstructive sleep apnea, and a history of anxiety which was helped by Klonopin. Tr. 225. On September 28, 2004, Dr. Kramer noted that Plaintiff's hypertension and dependent edema were "really controlled" on medications. Tr. 226. On November 10, 2004, Plaintiff requested that his anti-anxiety medication be changed to Doxepin, because he had taken it in the past for depression and anxiety and it helped him sleep better. Tr. 227. On November 30, 2004 (one month before his insured status expired), Plaintiff asked to switch back to Klonopin because Doxepin made him too lethargic. Plaintiff denied any specific complaints or problems. Dr. Kramer diagnosed Plaintiff with hypertension and insomnia with anxiety. Tr. 228.

On January 5, 2005, a few days after his insured status expired, Plaintiff requested medication refills for hypertension and anxiety, but had no specific complaints. Tr. 229. Plaintiff also submitted records to the Appeals Council for the time period of February 11, 2005 to December 20, 2006 (all after the time his insured status expired) that indicate he regularly requested medication refills from Dr. Kramer and his conditions were generally controlled with medication. Tr. 230-255.

10

Plaintiff alleges that: (1) the ALJ erred in relying on the Grids and not obtaining the testimony of a VE where he had nonexertional impairments, and (2) the ALJ failed to properly evaluate his credibility. The Commissioner contends that the ALJ's decision is supported by substantial evidence.

A.    Substantial Evidence

Plaintiff appears to allege that the ALJ's decision is not supported by substantial evidence. The Commissioner contends that the ALJ properly considered the medical evidence and opinions of record in determining that Plaintiff had the residual functional capacity ("RFC") for a full range of sedentary work.

Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence".

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

The ALJ's determination that Plaintiff had the RFC to perform sedentary work is supported by substantial evidence. None of Plaintiff's treating or examining physicians placed any restrictions on him which would preclude him from performing sedentary work (see Tr. 96-98, 129, 149, 157, 159, 160-161, 163). See Lee v. Sullivan, 945 F.2d 687, 693 (4th Cir. 1991)(finding that no physician opined that claimant was totally and permanently disabled supported a finding of no disability); Craig

v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)(treating physician's opinion entitled to great weight).[4] Although Dr. Forrest suggested postural limitations that do not appear in the ALJ's limitations, they would not have significantly affected the ability of Plaintiff to perform sedentary work. See SSR 96-9p (postural limitations or restrictions related to climbing, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of sedentary work because those activities are not usually required in sedentary work); SSR 83-14 and SSR 85-15 (stooping and bending are generally required only occasionally in sedentary work).

Although Plaintiff suffered from the severe impairment of lumbar stenosis, the ALJ's determination that Plaintiff could perform the full range of sedentary work despite this impairment is supported by substantial evidence. In February and March 1999, Dr. Forrest noted that Plaintiff's cervical and lumbar MRIs were unremarkable except for congenitally short pedicles in his lumbar area, diagnosed only muscular/mechanical pain, and recommended conservative treatment (see Tr. 177, 180). See, e.g., Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992)(conservative treatment was not consistent with an allegation of disability).

Nerve studies in March 1999 revealed no evidence of lumbar radiculopathy or peripheral nerve injury. Tr. 171-176. In July 1999, Dr. Forrest opined that Plaintiff was at maximum medical

---

[4]Although Dr. Hecker concluded that Plaintiff had functional limitations that precluded him from working, Dr. Hecker is a vocational expert and not a physician. It is the responsibility of the ALJ, not a vocational professional, to determine a claimant's functional limitations. See 20 C.F.R. §§ 404.1520, 404.1545-1546. A vocational expert's role in the disability determination process is limited to determining the vocational effect of the limitations found by the ALJ. See 20 C.F.R. § 404.1566(e). The limitations found by Dr. Hecker exceeded those found by Plaintiff's treating and examining physicians. Additionally, Dr. Hecker's opinion that Plaintiff could not work is an opinion on an issue reserved to the Commissioner and was not entitled to any special weight or significance. See 20 C.F.R. § 404.1527(e)(1); Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027 (10th Cir. 1994).

improvement, imposed a five percent of the whole person impairment rating for Plaintiff's low back, and concluded that Plaintiff could perform a limited range of light work. Tr. 163. A five percent impairment rating is not indicative of disability under the Social Security Act. See, e.g., Loving v. Department of Health & Human Servs., 16 F.3d 967, 968 (8th Cir. 1994)(workers' compensation disability rating of five percent, claimant found not disabled); Stephens v. Heckler, 766 F.2d 284, 285 (7th Cir. 1985)(thirty percent workers' compensation disability rating, claimant found not disabled); and Waters v. Gardner, 452 F.2d 855, 858 (9th Cir. 1971)(majority of doctors rated the claimant's disability at less than thirty percent, claimant found not disabled).

Although Plaintiff had the severe impairment of a small disc bulge in his neck, cervical MRIs in March and November 1999 were unremarkable. Tr. 180, 190-191. On October 15, 1999, Dr. Forrest noted that previous tests did not suggest disc disruption or nerve compromise in Plaintiff's neck. Tr. 150. The medical summary indicates that in January 2001 an MRI showed a possible disc bulge or minor herniation, but without cervical radiculopathy. Plaintiff, however, retained full cervical range of motion and admitted that his neck was okay as long as he did not turn his head too quickly. See Tr. 106-107, 115-117, 152-156, 163, 171-176.

The ALJ's determination that Plaintiff could perform the full range of sedentary work despite his carpal tunnel syndrome is supported by substantial evidence. Within ten days of his right carpal tunnel release surgery, Plaintiff had full range of motion in his right upper extremity. Tr. 137. In June 1999, it was noted that Plaintiff was doing well and steadily improving. In July 1999, Plaintiff's clinical examination and history were benign and Plaintiff could use his hand fully. Tr. 132, 136-137. Nerve studies in September 1999 were consistent with carpal tunnel syndrome, but showed no evidence of denervation or cervical radiculopathy. Tr. 152-156. In November 2000, Dr. Ernst noted

that Plaintiff was improving, but had somatic symptomatology. He stated that there were no significant signs either by history or physical examination of carpal tunnel syndrome bilaterally. Tr. 127-128. On November 10, 1999, Plaintiff had intact sensation to pinprick and normal peripheral pulses in his upper extremities and normal fine motor movements. Tr. 115-117. Plaintiff had full range of motion in his wrists and finger in May 2000. Dr. Ernst opined that Plaintiff was at maximum medical improvement and assessed only a ten percent permanent partial impairment to the right and left hand for median nerve symptomatology. Tr. 118-122, , 190-191.

The objective evidence did not support Plaintiff's claims that he had significant limitations stemming from carpal tunnel syndrome on his left side. It remained quiescent as of June 1999, and in August 1999, Dr. Ernst noted that Plaintiff's left side was stabilizing. Tr. 132, 137. In October 1999, it was noted that Plaintiff had "no true neurologic weakness through his left arm." Tr. 150.

Although Plaintiff testified at the hearing that he had anxiety (Tr. 280-281), the medical evidence did not reveal any significant complaints of anxiety or treatment for the condition. Dr. Forrest prescribed Klonopin, not for anxiety, but for burning sensations. Tr. 158. The evidence submitted to the Appeals Council following the ALJ's decision indicated that Plaintiff reported anxiety, but the condition was helped by Klonopin. See Tr. 225.

The ALJ found that Plaintiff had the severe impairment of peripheral vascular disease, but there was no evidence of limitations stemming from this condition which would have prevented Plaintiff from performing sedentary work. The medical evidence before the ALJ did not show significant treatment or complaints related to this condition. Dr. Groza apparently treated Plaintiff for lower extremity swelling related to "venous insufficiency," but recommended conservative treatment with Lasix. See Tr. 109. The medical evidence submitted to the Appeals Council revealed

14

that in June 2004, Plaintiff's lower extremity swelling from this condition was well-controlled with Lasix. Tr. 224, 225, 226. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1165-6 (4th Cir. 1986). Although Plaintiff's condition may have worsened in approximately August 2006 (see Tr. 241), that was more than a year and a half after his last date insured (December 2004).

      B.     Credibility

Plaintiff alleges that the ALJ failed to properly evaluate his pain and credibility. Specifically, Plaintiff claims that the ALJ failed to consider his testimony that he experienced muscle spasms three to five times a week that required him to stretch out on the floor, he experienced numbness and cramping in his hands that caused him to lose strength in his hands, and he was forced to elevate his feet and legs four to six hours a day due to swelling. The Commissioner contends that the ALJ properly considered Plaintiff's testimony and subjective complaints and concluded that they were not fully credible to the extent that Plaintiff claimed he was totally disabled.

In assessing credibility and complaints of pain, the ALJ must: (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d 585, 591-92 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he suffers. A claimant's

symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

The ALJ's determination that Plaintiff's subjective complaints were less than fully credible is supported by substantial evidence. The ALJ's decision is supported by the medical record, as discussed above. In particular, the medical evidence and opinions from Plaintiff's treating physicians supported a finding that Plaintiff was not as limited as he alleged. The results of Plaintiff's functional capacity evaluation, which indicated that he was exaggerating his symptoms and putting forth "submaximal effort" (Tr. 91), detracted from his credibility. See Stacy v. Chater, 70 F.3d 1263 (4th Cir. 1995)(Table)(ALJ properly gave a plain meaning to the phrase "exaggeration of symptomatology" and rationally concluded that there was a possibility that the claimant was malingering or faking his symptoms). The ALJ was entitled to discount Plaintiff's subjective complaints where inconsistencies were apparent in the evidence as a whole. See Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000)(ALJ may discount a claimant's complaints if inconsistencies are apparent in the evidence as a whole); SSR 96-7p (one strong indication of the credibility of an individual's statements is their inconsistency with other information in the case record).

Additionally, Plaintiff generally only took anti-inflammatory medications for his pain. See, e.g., Shively v. Heckler, 739 F.2d 987, 990 (4th Cir. 1984) (expressing approval of ALJ's consideration of a plaintiff's lack of strong pain medication); see also 20 C.F.R. § 404.1529(c)(3)(listing "other evidence" to be considered when "determining the extent to which [claimant's] symptoms limit [claimant's] capacity for work," including, "(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other

16

symptoms[.]"). Plaintiff was also treated conservatively for his musculoskeletal problems, his right-sided carpal tunnel surgery was relatively successful, and further surgical intervention for carpal tunnel syndrome was not recommended. See Robinson, 956 F.2d at 840(conservative treatment was inconsistent with allegation of disability).

  C. Grids

    Plaintiff alleges that the ALJ erred in relying on the Grids and in failing to obtain VE testimony. In particular, Plaintiff claims that the ALJ erred in using the Grids because he testified that he suffered from the nonexertional impairments of depression, limited use of his hand, and a need to elevate his feet and legs due to swelling. The Commissioner contends that there is no merit to Plaintiff's contention that he had nonexertional limitations that precluded the use of the Grids.

  When a claimant: (1) suffers from a nonexertional impairment that restricts his ability to perform work of which he is exertionally capable, or (2) suffers an exertional impairment which restricts him from performing the full range of activity covered by a work category, the ALJ may not rely on the grids and must produce specific vocational evidence showing that the national economy offers employment opportunities to the claimant. See Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989); Hammond v. Heckler, 765 F.2d 424, 425-26 (4th Cir. 1985); Cook v. Chater, 901 F. Supp. 971 (D.Md. 1995). A nonexertional impairment is an impairment which is present whether the claimant is attempting to perform the physical requirements of the job or not. See Gory v. Schweiker, 712 F.2d 929 (4th Cir. 1983); see also 20 C.F.R. § 404.1569a. Every nonexertional condition does not, however, rise to the level of a nonexertional impairment. The proper inquiry is whether there is substantial evidence to support the finding that the nonexertional condition affects an individual's

17

residual capacity to perform work of which he is exertionally capable. Walker, 889 F.2d at 49; Smith v. Schweiker, 719 F.2d 723, 725 (4th Cir. 1984).

Here, the ALJ's decision to use the Grids was correct under controlling law and supported by substantial evidence because the ALJ determined that Plaintiff maintained the RFC for sedentary work and he did not find that Plaintiff's ability was reduced by any nonexertional impairments. Plaintiff's treating physicians did not impose any nonexertional limitations on Plaintiff's ability to work that were inconsistent with the ALJ's findings. The postural limitations Dr. Forrest outlined (see Tr. 163) would not have significantly eroded the sedentary occupational base so as to preclude reliance on the Grids. See SSR 96-9p. As discussed above, Plaintiff retained full range of motion of his wrists and fingers, full use of his upper extremities, intact sensation to pinprick, normal peripheral pulses in his upper extremities, and normal fine motor movements. See Tr. 115-117, 118-122, 132, 136, 137. There is little evidence of peripheral vascular disease in the medical record presented to the ALJ, and later evidence submitted to the Appeals Council indicated that Plaintiff's lower extremity swelling was well-controlled and stable on medication. See Tr. 224-226. Further, the ALJ did not find Plaintiff's allegations to be fully credible.

There was no medical evidence of any significant complaints or treatment for anxiety or depression[5] before the ALJ. A claimant's lack of treatment may be considered in evaluating whether an impairment is disabling. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994)(finding that

---

[5] Although Plaintiff discusses "depression" as a nonexertional impairment in this action (Plaintiff's Brief at 3), he does not appear to have alleged disability due to depression or cited any evidence in the record concerning depression. The page in the hearing transcript cited by Plaintiff (Tr. 279) does not discuss any complaint of depression. Plaintiff may instead be referring to the nonexertional impairment of anxiety, as has been discussed above.

inconsistency between the level of claimant's treatment and her claims of disabling pain supported the conclusion that claimant was not credible).

## CONCLUSION

Despite Plaintiff's claims, he fails to show that the Commissioner's decision was not based on substantial evidence. This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, supra. Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock v. Richardson, supra. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, supra. It is, therefore,

RECOMMENDED that the Commissioner's decision be affirmed.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

July 30, 2008
Columbia, South Carolina